IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ARCHIE L. BENTZ, JR.,

                                Plaintiff,

    v.

CAROLYN COLVIN,
Commissioner for Social Security,

                                Defendant.

OPINION & ORDER

13-cv-441-wmc

Pursuant to 42 U.S.C. § 405(g), plaintiff Archie L. Bentz, Jr., seeks judicial review of a final decision of the Commissioner of Social Security finding him not disabled within the meaning of the Social Security Act. Bentz principally contends that the court must remand because Administrative Law Judge John H. Pleuss ("ALJ") erred in (1) improperly weighing the opinions of two treating doctors and one examining doctor, (2) improperly analyzing Bentz's credibility, and (3) improperly accounting for an earlier VA disability determination. For the reasons set forth below, the court will remand the case to the Commissioner for further proceedings.

BACKGROUND

## I.  Background

On June 17, 2008, Archie Bentz, Jr. filed an application for Social Security Disability benefits alleging disability since April 20, 2007. (AR 245-253.) His application was denied initially. (AR. 161-169.) On February 24, 2009, Bentz requested a hearing before an ALJ. (AR. 170-171). By decision dated June 23, 2010, the ALJ found Bentz not

disabled. (AR 122-137.) Bentz requested review of the ALJ's decision by the Appeals Council on July 30, 2010.[1] (AR 184.) On October 16, 2011, the Administration found Bentz disabled since June 24, 2010, the day after the ALJ's decision, based on his second application. (AR.146-149.) Bentz then filed a timely complaint for judicial review in this court pursuant to 42 U.S.C. §405(g).

## II. Relevant Medical Evidence

### A.  2007 Knee Surgery

On June 25, 2007, Bentz was seen by Jeffrey R. Stitgen, M.D., for an orthopedic evaluation of persistent left knee pain secondary to a tibial plateau fracture that occurred in January 2007. (AR. 489.) Bentz height was recorded at 73 inches and he weighed 260 pounds. (*Id*.)  An examination revealed a left knee effusion, pain at the medial joint line, and patellofemoral crepitus and lateral tilt of the patella (AR. 490). Dr. Stitgen reviewed an MRI that showed a torn medial meniscus which corresponded to Bentz's physical exam.  Dr. Stitgen diagnosed a meniscus tear and patellofemoral disease. He recommended lateral release and/or debridement of the left knee. *Id.*

On June 27, 2007, Bentz was seen by Randy S. Heidel, M.D., for pre-operative assessment. (AR. 484.) On July 5, Bentz was scheduled for left knee arthroscopy with partial medical meniscectomy and possible lateral release. (*Id.*) Dr. Heidel also prescribed a trial of Gabapentin. (AR. 486.)

---

[1] While immaterial to the present case, Bentz also filed a subsequent application on July 5, 2010. (AR 184).

On July 13, Bentz was seen for a checkup, one-week post arthroscopic surgery. (AR. 475.) Dr. Stitgen's examination revealed swelling at the lateral release site. (*Id.*) On July 16, Bentz was again seen for a checkup some 11 days post left knee arthroscopy. The notes from that visit discuss "serious drainage from the distal most end of the incision." (AR. 472.)  For this, Bentz was prescribed Keflex. (*Id.*)

At yet another follow up on July 24, Bentz's portal site was found to be "very swollen" with "erythema surrounding the entire incision." (AR. 465.)  On, July 31, 2007, an examination revealed some erythema of the incision and swelling (AR. 462). On August 7, an examination also revealed "quite a lot of fluid and swelling." (*Id.)* Dr. Stitgen diagnosed "swelling status, post left knee arthroscopy, and he prescribed a knee sleeve, as well as Gabapentin, Ibuprofen 800mg, and Oxycodone-Acetaminophen. (AR. 455-456).  No further medical exams are notable in 2007.

## B.  2008 Chronic Back Pain

On April 2, 2008, Bentz presented to Dr. Heidel with complaints of chronic, intermittent back pain and fatigue. (AR. 430.) Dr. Heidel noted that x-rays demonstrated degenerative changes of the spine and referred Bentz to physical therapy. (*Id.*)  On April 30, Bentz presented to JoAnne Kriege, M.D., for a rheumatology consultation due to joint pain. (AR. 397-399.) Dr. Kriege noted a significant medical history of shrapnel injury in the 1970's, resulting in the loss of his left eye, significant nerve damage in his left leg, and chronic back pain. (AR. 397.)  For this, he received treatment from May 2005 through to April 2008 at the Veteran's Affairs Medical Center ("VAMC") and was diagnosed with osteoarthritis of the lumbar spine. (AR. 395.)

X-rays taken in 2008 showed findings consistent with a diagnosis of diffuse idiopathic skeletal hyperostosis ("DISH").[2] Dr. Kriege noted that Bentz also had a significant history of tibial plateau fracture on the left meniscal tear with extensive additional patellofemoral arthritis revealed by arthroscopic surgery in July 2007, treated with debridement and meniscectomy. (*Id.*)

Dr. Kriege's April 30, 2008, examination indicates that:  Bentz's height was 70.5 inches and he weighed 261 pounds; he had an artificial left eye, mild lumbar paraspinous tenderness and lower back pain produced with range of motion in the left hip; and he had a mildly restricted full flexed abduction of the right hip without pain. (AR. 398.) Based on these findings, Dr. Kriege diagnosed "osteoarthritis of the lumbosacral spine and thoracic spine with osteophytes of the thoracic spine consistent with DISH." (*Id*).

C.  2009-2010 Deterioration

On April 10, 2009. Dr. Kriege completed a Multiple Impairment Questionnaire. (AR. 734-41.) She diagnosed both DISH and osteoarthritis of the knees. (AR. 734.) In support of her diagnoses, Dr. Kriege cited clinical findings of tenderness in the joint lines of the knees, as well as x-rays. (AR. 734-735.) Bentz reported her primary symptoms were pain in the back and knees, described as "severe at times," occurring daily, and precipitated by weight bearing and prolonged sitting. (AR. 735-736.)

---

[2] Diffuse idiopathic skeletal hyperostosis "DISH" also known as Forestier's disease and ankylosing hyperostosis), generally present symptoms present with spinal stiffness on forward flexion/back extension, or with mild back pain.
(http://en.wikipedia.org/wiki/Diffuse_idiopathic_skeletal_hyperostosis#Symptoms).

Dr. Kriege ultimately opined that in an 8-hour workday, Bentz could only sit for one hour or less and stand/walk for one hour or less. Accordingly, Kriege found that when sitting for 15 minutes, Bentz needed to be able to alternate positions, as well as get up and move around before sitting again. (AR. 736-737.) Bentz could frequently lift/carry up to five pounds and occasionally lift/carry between 5-10 pounds (AR. 737). Kriege reported that Bentz's symptoms were frequently severe enough to interfere with his attention and concentration. (AR. 739.) Bentz also reported having good and bad days. (AR. 740.) Dr. Kriege estimated that Bentz would be absent from work more than 3 times a month as a result of his impairments or treatment. (*Id.*)[3]

On August 27, 2010, Dr. Heidel's examination also revealed limited flexion and extension at the waist. (AR. 999.) On August 30, 2010, Dr. Heidel completed a Multiple Impairment Questionnaire. (AR. 965-973.) He reported treating Bentz since April 9, 2007, for DISH and degenerative joint disease of the lumbar spine (AR. 965.) At least by August of 2010, Heidel considered Bentz's prognosis to be "poor." *Id.* In support of his findings, Dr. Heidel referred to treatment records and imaging studies. (AR. 965-66.) Bentz's symptoms were described as chronic, mid- and lower back pain, coupled with significantly reduced endurance precipitated by prolonged standing, sitting, or bending. (AR. 966.) Dr. Heidel noted further that these symptoms and limitations began in 2007. (AR. 971.)

---

[3] In a letter dated March 30, 2010, Dr. Kriege also opined that between April 9, 2007 and April 2, 2010, Bentz's severe thoracic and lumbar spine arthritis was medically equivalent to Medical Listing 1.02. (AR. 1032-1033.)

As a result, Dr. Heidel opined that in an 8-hour workday, Bentz could sit for 4 hours, stand/walk for 2 hours; he also found that Bentz required a 5 minute break for every 10 minutes of sitting or standing. (AR. 967-68.) Even so, Heidel believed that Bentz could occasionally lift/carry up to 10 pounds, and he was "moderately limited" (defined as significantly limited, but not completely precluded) in the use of his arms for reaching, including overhead. (AR. 968-69.) Bentz's symptoms were also found to be "frequently severe enough to interfere with his attention and concentration." (AR. 970.) Dr. Krieger, Heidel noted that Bentz had good and bad days. (AR. 971.) Again, just as Krieger had, Dr. Heidel opined that "on average," Bentz would be absent from work about 2-3 times a month as a result of his impairments or treatment. (*Id.*)

Finally, Mark C. Moore, M.D. completed an August 28, 2009 Spinal Impairment Questionnaire for the ALJ as the examining doctor in these proceedings. (AR. 954-960.) Dr. Moore diagnosed DISH and degenerative joint disease of the lumbar spine. (AR. 954.)  He, too, found that Bentz's prognosis was poor. (*Id.*) Positive clinical findings included limited range of motion and tenderness in the thoracic spine. (AR. 954-955.) Dr. Moore cited an x-ray of the thoracic spine and an MRI of the lumbar spine.  In support of his diagnoses, (AR. 956), Moore also noted Bentz's symptoms included chronic low back and thoracic spine pain precipitated by standing. (AR. 956-957).

Ultimately, Dr. Moore opined that in an 8-hour workday, Bentz could only stand 10 minutes at a time or walk for 2 hours at a time.  He also found that Bentz must get up and move around every hour when sitting for 5 minutes before sitting again. (AR. 957.) Dr. Moore opined that Bentz could occasionally lift/carry up to 10 pounds. (AR. 957-

958.) Dr. Moore, too, noted Bentz reporting "good and bad days, "and his estimate that, on average, he would be absent from work more than three times a month as a result of his impairments or treatment. (AR.959.)

### III. The ALJ Decision

Despite finding severe diffuse idiopathic skeletal hypertosis impairments, multi-level degenerative disc disease, degenerative changes of the left knee, and left eye blindness, on September 21, 2012 ALJ Pleuss found that Bentz:  (1) retained the residual functional capacity ("RFC") to perform sedentary work limited to occasional climbing, stooping, bending, or crouching; (2) was precluded from crawling or kneeling; (3) required a sit/stand option; and (4) could not sit for more than 60 minutes at a time or stand more than 15 minutes at a time. (AR. 35.)  The ALJ further noted that Bentz would likely to be off task for about 5 percent of the workday, and that he had vision in only one eye. (*Id*.) Based on this RFC, the ALJ found that Bentz was capable of performing past relevant work as a millwork salesperson. (*Id*.)

OPINION

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

After reviewing the record, the court concludes that the ALJ erred in analyzing the opinions of treating doctors Heidel and Kriege.  The ALJ also erred with respect to his analysis of Dr. Moore – as an examining physician.  Such errors require remand.  The court will not, however, go as far as to award benefits given that further factual development is required consistent with this opinion.

## I.  The ALJ's Improper Analysis of Treating and Examining Doctors

Bentz argues that his treating doctors should have been afforded controlling weight and that the ALJ erred in failing to comply with SSR 96-2p and 20 CFR 416.927. In particular, Bentz argues that the ALJ failed to properly weigh Dr. Moore's evidence in light of the factors laid out in 20 CFR 416.927.

As a starting point, when an ALJ "chooses to reject a treating physician's opinion, [he] must provide a sound explanation for the rejection."  *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).  That explanation must allow a reviewing court to conclude that the ALJ actually "weighed the merits of [a source's] opinion [and] engaged in the careful analysis required by the regulations and case law."  *Id.*

To properly frame the ALJ's analysis, the regulations provide a checklist of factors to facilitate his legal reasoning and explanation of the evidence.  Such factors determine

what weight the ALJ affords to the medical opinions in the record, providing transparency in the ALJ's reasoning for judicial review. *See* SSR 96-2p and 20 CFR 416.927. Upon appeal, the Commissioner cannot cure deficiencies in the ALJ's analysis by supplying his own evaluation of a medical opinion, nor is it appropriate for this court to engage in its *own* analysis of the factors -- "what matters are the reasons articulated by the ALJ." *Jelinek*, 662 F.3d at 812 (original emphasis).

The factors an ALJ should consider are set out in 20 C.F.R. § 404.1527(c) and include:

1.   whether the doctor has an examining relationship with the plaintiff;

2.   whether the doctor has a treating relationship with the plaintiff, which also incorporates the length, nature, and extent of the relationship;

3.   how well supported the doctor's opinion is by relevant evidence;

4.   how consistent the doctor's opinion is with the record as a whole;

5.   whether the doctor has a relevant specialization; and

6.   any other factors that tend to support or contradict the opinion.

If an ALJ does not properly analyze these factors, remand is warranted. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (remanding when "the ALJ failed to determine the weight to be accorded [a doctor's] opinion in accordance with Social Security Administration regulations").

Here, the ALJ articulated reasons for rejecting Bentz's treating physicians' opinions do not hold up to scrutiny, nor does his analysis include any discussion of other pertinent § 1527(c) factors and other relevant evidence that might weigh in Bentz's

favor.  These deficiencies warrant remand.  *See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (reversing an ALJ even when her "decision indicates that she considered opinion evidence in accordance with §§ 404.1527 and 416.927 [but] does not explicitly address the checklist of factors as applied to the medical opinion evidence") (emphasis added); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

Specifically, the ALJ gave "little weight" to Dr. Heidel's medical opinion, finding that Dr. Heidel only treated Bentz on an intermittent basis and concluding that his opinions were not based on clinical or objective findings.  But this analysis does not square with the record. As an initial matter, Dr. Heidel referred to his treatment records dating back to April of 2007, as well as past imaging studies dating back to April of 2008, in support for his opinion regarding medical restrictions on Bentz's capacity to work. (AR. 965-66.) Additionally, examinations by Dr. Heidel revealed decreased range of motion in the back (AR. 793, 999) and X-rays demonstrated degenerative changes of the spine. (AR. 430.) Certainly, this unaddressed or summarily dismissed evidence is material and undercuts the ALJ's reasons for rejecting Dr. Heidel's opinion as controlling. Upon remand, the ALJ should not only re-consider this evidence, but weigh it against other evidence in the record,[4] before deciding to discount Dr. Heidel's evidence as controlling.

---

[4] For example, an MRI of the lumbar spine was found to demonstrate multilevel degenerative disk and joint disease, a small left paracentral disk herniation at L1-2, mild bilateral lateral recess stenosis at L3-4, borderline central stenosis at L3-4 and L4-5, and a tiny subligamentous central disk herniation at L5-S1.(AR. 826.) In addition, the ALJ should consider an MRI of the sacroiliac joints found to demonstrate degenerative changes of the right sacroiliac joint, associated subchondral edema in the lateral aspect of the sacrum on the right with associated minor enhancement, and bony sclerosis, indicative of osteoarthritis. (AR. 825.)

In addition, the ALJ gave "partial weight" to the opinions from Bentz's treating rheumatologist, Dr. Kriege. (AR. 33). As support, the ALJ noted that Dr. Kriege only evaluated Bentz on two occasions during the "relevant period." (*Id.*) The ALJ also found that the limitations described in Dr. Kriege's questionnaire were based primarily on Bentz's subjective complaints, rather than appropriate medical findings. (AR. 34).

Given that Dr. Kriege actually cited clinical findings of tenderness in the joint lines of the knees, as well as x-rays in support of her diagnoses, this superficial analysis is demonstrably wrong at worst and deficient at best.  It is at least deficient because the analysis hardly provides substantial evidence for discrediting the opinion when Dr. Kriege cited clinical findings of tenderness in the joint lines of the knees, as well as x-rays in support of her diagnoses. AR. 734-735. In addition, X-rays ordered by Dr. Kriege showed findings consistent with a diagnosis of diffuse idiopathic skeletal hyperostosis ("DISH"). Without proper analysis of this evidence, the court has little choice but to remand the ALJ's decision so that this evidence may be re-evaluated when weighing Dr. Kriege's medical opinions. *See* 20 C.F.R. § 404.1527(c)(2)(The Commissioner must give controlling weight to a treating physician's opinion that is "well- supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record.").

Even if the ALJ was not required to give the opinions from Drs. Heidel and Kriege controlling weight, SSR 96-2p states that "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527."  While Drs. Heidel and Kriege only examined Bentz on several occasions, he

11

was regularly treated at the Dean Clinic, where both doctors supervised staff. Moreover, Dr. Kriege is also a certified specialist in rheumatology and her opinion should have been afforded heightened weight with respect to her assessment of Bentz's limitations summarized earlier on page five.  *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Finally, the ALJ erred by rejecting the opinion from the examining occupational medicine specialist, Dr. Moore. The ALJ purportedly found those opinions to be unsupported by appropriate medical findings and by the fact that Dr. Moore only evaluated Bentz on one occasion. (AR. 34.)  Certainly, Dr. Moore's opinions are not entitled to the same deference as a treating source, but he is still an examining source who provided opinions consistent with the record based on clinical and diagnostic abnormalities. In addition, Dr. Moore is a relevant specialist in the area of occupational medicine. Because each of these important factors were apparently ignored by the ALJ in assessing Dr. Moore's opinions, the court must also remand. *See* 20 C.F.R. § 404.1527(c)(1).

For all of the reasons stated, if controlling weight is not afforded to Drs. Heidel and Kriege, and Dr. Moore's opinions are essentially rejected, the ALJ will need to ensure that all of the relevant factors have been considered in assessing their weight, and that the reasons for those findings and conclusions with respect to each are properly documents in the ALJ's opinion upon remand.

## II. Bentz's Remaining Issues

Bentz also contends that the ALJ:  (1) improperly analyzed Bentz's credibility *vis-à-vis* his disability claim; and (2) improperly accounted for an earlier VA disability determination.  Having already found legitimate grounds for remand, the court need not address these issues in detail. *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011). Still, some limited guidance may be helpful when the issues are reconsidered on remand.

As to credibility determinations, it is perhaps worth noting that should the ALJ afford greater weight to treating and examining doctors discussed above, this would seem to bolster Bentz's credibility, which may impact the ALJ's RFC determination. As for addressing the VA Decision, the ALJ may be well served to examine the evidence referred to in the VA Decision, which appears to support Bentz's claimed physical limitations, or at least explain further how the VA came to a disability rating when the ALJ did not. (AR. 35.)  This would seem particularly appropriate given that the ALJ purported to afford some weight to that decision.

In providing this guidance, the court does not intend to suggest the result that should be reached on remand.  Rather, the court encourages the parties and the ALJ to consider the evidence and issues, including but not limited to deficiencies identified in this order.  *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (2014) (the court need not address plaintiff's remaining argument, but noting that on remand the ALJ will need to take a "fresh look" at the RFC and vocational questions after the credibility issue has been re-evaluated); *Mollett v. Astrue*, No. 3:11–CV–238 2012 WL 3916548, at *9-10 (N.D. Indiana Sept. 7, 2012) ("[b]ecause the ALJ's error regarding the hypothetical questions

13

requires remand, the court need not consider the claimant's arguments regarding the remaining issues"); *Madrid v. Barnhart*, 447 F.3d 788, 792 (10th Cir. 2006) (when the ALJ's error affected the analysis as a whole, court declined to address other issues raised on appeal).

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Archie L. Bentz, Jr.'s application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered on this 24th day of August, 2015.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge